# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 9, 2013 Session

## STATE OF TENNESSEE v. JOHN T. FREELAND, JR.

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-409      Roy B. Morgan, Jr., Judge**

**No. W2011-01828-CCA-R3-DD  - Filed June 3, 2013**

The Defendant, John T. Freeland, Jr., appeals from his Madison County Circuit Court convictions of first degree premeditated murder, *see* Tenn. Code Ann. § 39-13-202(a)(1); first degree murder committed in the perpetration of an especially aggravated kidnapping, *see id*. § 39-13-202(a)(2); especially aggravated kidnapping, *see id*. § 39-13-305; and tampering with evidence, *see id*. § 39-16-503(a)(1).  Following a bench trial regarding both guilt and punishment, *see id*. § 39-13-205, the trial court sentenced Defendant to death for each first degree murder conviction based upon its findings that the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence, *see id*. § 39-13-204(i)(2); the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant, *see id*. § 39-13-204(i)(6); the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, an aggravated robbery, *see id*. § 39-13-204(i)(7); and that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The trial court also imposed consecutive sentences of 20 years' incarceration for the especially aggravated kidnapping conviction and five years' incarceration for the tampering with evidence conviction.  In addition to challenging the sufficiency of the evidence to support his convictions of first degree murder and especially aggravated kidnapping, Defendant challenges the trial court's denial of his motion to suppress statements and the imposition of the death penalty.  Because we determine that the trial court failed to merge the first degree murder convictions at sentencing, we remand the case for correction of the judgments to effectuate proper merger. In all other respects, however, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed as Modified; Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ. joined.

A. Russell Larson and Angela Hopson, Jackson, Tennessee, for the appellant, John T. Freeland, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On March 7, 2009, Harold Cain visited his parents' land in the Dry Creek Lane area of Pinson, Tennessee. While he and his father, W.S. Cain, drove "up in the woods looking around," they heard a single gunshot. Mr. Cain could not determine the direction of the shot, so he "fired [his] pistol three or four times into the ground to let people know that [they] were in the area." As he and his father returned to the highway via Dry Creek Lane, they "saw something on the side of the road" that they hoped was "a bag of clothes or trash." As they approached, they realized that the item was "a body facing down," parallel to the road. Mr. Cain immediately telephoned 9-1-1.

Once on the telephone with 9-1-1, the 9-1-1 operator asked Mr. Cain to check the victim for a pulse. Mr. Cain recalled that the victim had no pulse. He also determined that the victim had recently died because the body was not cold to the touch. Mr. Cain reported to 9-1-1 that the victim had suffered a "massive head injury" from an apparent gunshot wound. The 9-1-1 operator instructed the Cains to secure the scene and wait for the police to arrive. Mr. Cain testified that approximately 15 minutes passed from his hearing the single gunshot to discovering the victim's body on the side of the road.

On cross-examination, Mr. Cain explained that, after hearing the gunshot, he fired his pistol into the base of a tree. He testified that he and his father were approximately 200 yards away and out of view from the area where he discovered the victim's body minutes later. He said that approximately 10 minutes passed while he and his father waited for the police to arrive and that no one entered the scene during that time.

On March 7, 2009 at approximately 3:22 p.m., Deputy Bradley Crouse of the Chester County Sheriff's Department (CCSD) responded to investigate the discovery of a body on Dry Creek Lane. Henderson Police Department (HPD) Officer Jason Rose arrived soon thereafter to assist Deputy Crouse. Mr. Cain directed the officers to the victim's body. Deputy Crouse testified at trial that he "observed a white female lying face down to the right side of the roadway. It was gravel road with blood pooling around her head." Deputy Crouse did not collect any evidence. He instead secured the area and immediately contacted the Tennessee Bureau of Investigation (TBI) to investigate the incident. In securing the area,

Deputy Crouse instructed Mr. Cain to move his vehicle, which was parked within the perimeter of the crime scene. Deputy Crouse denied that Mr. Cain's checking the victim's pulse contaminated the crime scene. He recalled seeing tire tracks in the gravel road indicative of someone's accelerating while leaving the scene.

Doctor Paul Schwartz, Medical Examiner for Chester County, arrived at the scene to determine the victim's cause and time of death. He found the victim lying in the dirt road with a gunshot wound to her head. He observed the "early state of clotting" of blood around the victim's head and her "reasonably warm" skin. Thus, Doctor Schwartz determined that the victim's death had occurred "relatively recent[ly]." He also observed what appeared to be a 9 millimeter shell casing near the victim's body.

A few hours later, Deputy Mark Taylor of the Madison County Sheriff's Department (MCSD) arrived at the scene of a burning vehicle on Potts Chapel Road in nearby Madison County. He observed that the car was "completely burned" and "r[a]n the VIN number" to determine ownership of the vehicle. When he checked the vehicle identification number, the MCSD dispatcher instructed Deputy Taylor to contact the Chester County Sheriff's Department because the car was "wanted in relation to something else." Once CCSD investigators arrived at the scene of the burned vehicle, Deputy Taylor learned that the car was registered to Carolyn Ward.

CCSD Investigator Jason Crouse (Deputy Bradley Crouse's brother) learned that MCSD officers had discovered a burned car and suspected the vehicle could be linked to the body found on Dry Creek Lane. From the vehicle's registration information, Investigator Crouse looked up Carolyn Ward's driver's license information. He then determined the victim on Dry Creek Lane to be Carolyn Ward. Investigator Crouse also learned that the victim's daughter, Mary Davis, worked as a corrections officer in the Chester County Jail. He went to the jail to inform Ms. Davis of her mother's death. Investigator Crouse recalled that, although Ms. Davis was aware of a body's discovery on Dry Creek Lane, she was "very surprised" to learn that the victim was her mother.

Doctor Staci Turner, a forensic pathologist with Forensic Medical at the time of the victim's death, performed the autopsy of the victim. Doctor Turner determined that the victim suffered a gunshot wound to her head and right hand. She explained at trial that a bullet entered the victim's head on the right back side and exited on the left temple. She testified that the bullet damaged "multiple areas of the brain" as it forged a path from the "right to left, back to front, and slightly upward" direction through the victim's head. She opined that the wound was not survivable. Doctor Turner's examination also revealed a gunshot wound to the back of the victim's right hand that exited through the victim's palm,

causing a contact burn to one of the fingers. Doctor Turner testified that it was "possible" that a single bullet caused the victim's injuries.

Emma Hawkins, a forensic technician with Forensic Medical, collected clothing and other items from the victim's body. She also collected fingerprints and a deoxyribonucleic acid (DNA) sample from the victim for later use by the TBI in the investigation of the victim's death.

Donnie Davis, the victim's son-in-law, last talked to the victim at approximately 1:30 p.m. on March 7, 2009. He recalled that the victim telephoned him to inform him that she had picked up his family's dog at the groomer and dropped it off at his home. Mr. Davis returned home at approximately 2:15 p.m. to find the dog at home. His wife, Mary Davis, was asleep having worked the third shift at the jail the night before.

Mary Davis learned of her mother's death while at work on the night of March 7-8, 2009. She testified at trial that she had given her mother a cellular telephone just prior to her death. By locating the packaging from the telephone, Ms. Davis provided the serial number of the telephone to investigators. Investigators later located the cellular telephone at the Defendant's residence.

Johnna Arnold, the victim's best friend, had taken the victim to lunch in Jackson on March 7, 2009. After lunch, Ms. Arnold asked the victim to join her while she ran errands. The victim declined because she needed to pick up Ms. Davis's dog at the groomer by 2:00 p.m. Ms. Arnold recalled telling the victim that Fred's in Henderson had Pepsi on sale. The victim indicated that she would go to Fred's to purchase Pepsi later that afternoon. Sometime before 2:00 p.m., Ms. Arnold saw the victim leaving the Fred's parking lot. She noticed a passenger in the victim's car. She also noticed that the victim was driving faster than usual and that another car followed closely behind the victim's car as it exited the parking lot. Ms. Arnold testified that both vehicles turned onto the highway toward Pinson, Tennessee. Ms. Arnold described the passenger in the vehicle as having a "black" complexion, but she admitted that she could not see any distinct facial features because the passenger was wearing a hooded sweatshirt.

Jeff Bobo, manager of the Piggly Wiggly Market in Henderson, testified that his store shares a parking lot with Fred's. He said that the store maintains video surveillance of the parking lot. He provided surveillance footage from March 7, 2009, to Deputy Blair Weaver of the CCSD.

Mr. Weaver, who was Chester County Sheriff at the time of the trial, obtained the surveillance recording from Mr. Bobo. On the video, Sheriff Weaver observed the victim's

car leaving the parking lot at approximately 1:57 p.m. He also observed a blue Buick Roadmaster following the victim's car. Sheriff Weaver alerted law enforcement that the Buick was a "suspect" vehicle.

CCSD Chief Deputy Mark Griffin responded to the scene at Dry Creek Lane. He described the area as "a one lane dead end road out in the rural part of the country." Deputy Crouse and Officer Rose had already secured the scene when Chief Deputy Griffin arrived. Chief Deputy Griffin observed "blood pooling around the [victim's] head." He also observed a gunshot wound to the victim's right hand and a burn on one of the victim's fingers. He located a bullet near the victim's right hand and a single .38 caliber shell casing at the scene. Through his investigation, he learned that a Buick traveled "in close proximity" to the victim as she left the Fred's parking lot. Chief Deputy Griffin sought the assistance of the Jackson Police Department (JPD) "Gang Unit" to locate the vehicle, owned by the Defendant. After taking the Defendant's statement, Chief Deputy Griffin revisited the arson scene and located two license plates, registered to the victim's 1996 Chevrolet Corsica, that had been thrown into the woods. This was the vehicle that had been burned in Madison County.

On cross-examination, Chief Deputy Cain testified that when he arrived at the scene, Mr. Cain's vehicle was located inside the perimeter tape. He then asked Mr. Cain to move the vehicle outside the perimeter. Although he observed tire tracks in the gravel road, he did not take any tire print castings. He testified that the "tire prints" appeared to be "where gravel had been spun loose from the packed down roadway." He said that the tires on Mr. Cain's vehicle bore a "distinctive tread pattern" that did not match the tracks that he observed.

On March 9, 2009, JPD Sergeant Phillip Kemper and Captain Patrick Willis briefed Investigators Samuel Gilley and Warren Olden, both members of the Street Crimes Unit in March 2009, to be on the lookout for a blue Buick Roadmaster believed to have been involved in the victim's homicide. During the briefing, the investigators watched the surveillance video from the Piggly Wiggly parking lot and observed a "heavy set black male," who was suspected to be involved in the victim's death. The investigators also learned that the victim's assailant employed a small caliber handgun.

Sometime the next day, Investigators Gilley and Olden located a blue Buick Roadmaster parked near a mechanic shop in Jackson. The investigators parked at a nearby church until someone exited the shop to leave in the vehicle. They then saw a "[h]eavy set black male [with] dreadlocks" get into the vehicle. Although the traffic was too heavy to stop the vehicle at that time, the investigators ran the license tag number of the vehicle and learned that it was registered to the Defendant. A search of the Defendant's driver's license

records confirmed that he was the individual fitting the description seen driving the vehicle. The investigators also learned that the Defendant was driving on a suspended license.

Later that day, the investigators located the vehicle once more at the Park Place Apartments in Jackson where they were able to initiate a stop. Investigator Gilley then arrested the Defendant for driving on a suspended license. Investigator Olden approached the passenger side of the vehicle where Marcus Thompson was seated. He observed the butt of a handgun near the power seat controls on the passenger seat. Because Mr. Thompson did not have a valid driver's license, the investigators towed the vehicle. A search of the vehicle uncovered a bandana, two ski masks, a pair of green and white "batting gloves," a newspaper opened to the story of the victim's murder, a "small amount of marijuana," and a live round of .38 caliber ammunition.

TBI Special Agent Mark Lewis and CCSD Chief Deputy Griffin consulted JPD Sergeant Kemper after the initial investigation of the victim's death revealed that the victim "didn't have any enemies. And [the death] appeared to be something that could have possibly been gang related." Sergeant Kemper briefed members of the Street Crimes and Gang Enforcement Units to be on the lookout for the blue Buick Roadmaster. Sergeant Kemper arrived at the scene of the Defendant's March 10, 2009 arrest and immediately recognized that Mr. Thompson wore "gang type clothing." He testified at trial that the items recovered from the Defendant's vehicle – bandanas, ski masks, and gloves – were "gang type paraphernalia." Sergeant Kemper further testified that the discovery of the vehicle, .38 caliber handgun, ski masks, and newspaper article concerning the victim's death "definitely indicated" the Defendant's involvement.

Sergeant Kemper, with the assistance of Captain Willis, took three statements from the Defendant. Prior to each statement, he read the Defendant a rights waiver, the Defendant indicated his understanding of his rights, and the Defendant signed a waiver each time.

In his first statement to investigators, made at 8:00 p.m. on March 10, 2009, the Defendant denied being in Henderson on March 7, 2009. Once confronted with the surveillance video from the Piggly Wiggly parking lot, the Defendant admitted that he had been in Henderson on the day of the victim's death. The Defendant told investigators that he, Mr. Thompson, and Tashondra Mosely (Mr. Thompson's girlfriend) traveled to Henderson in the Defendant's car. At the Fred's parking lot, Mr. Thompson approached the victim's vehicle, got into the passenger seat, and ordered the victim to drive while the Defendant and Ms. Mosely followed in the Defendant's car. They stopped once on the side of the highway when the victim suffered an apparent epileptic seizure. The Defendant told investigators that he saw Mr. Thompson pull a gun on the victim and order her to "wake up." He said that the victim "came to," and they drove off again. The Defendant claimed that Mr.

Thompson told him "he was going to drop [the victim] off" and instructed the Defendant and Ms. Mosely to drive in another direction. The Defendant told investigators that they later met Mr. Thompson, who was driving the victim's car, at a Texaco where they purchased gasoline and switched vehicles. The Defendant and his cohorts then left his vehicle at Lincoln Elementary School in Jackson, and the three went to Memphis in the victim's car with plans to commit a robbery. When their trip to Memphis proved fruitless, the three returned to Jackson, picked up the Defendant's car, and drove both vehicles to an isolated area where they salvaged items from the victim's car. Mr. Thompson then doused the car with gasoline to set it on fire. The Defendant told investigators that he found two license plates in the victim's trunk that he threw into the woods. The Defendant claimed that he did not know that Mr. Thompson had a gun or that Mr. Thompson intended to kill the victim.

On March 11, 2009, at 6:05 p.m., the Defendant asked to speak with investigators in order to "clear up some things" from his first statement. After executing a second rights waiver, the Defendant told investigators that he and Mr. Thompson planned to go to Henderson "to get a car to go to Memphis in" to commit a robbery. After following two other vehicles without attempting to take them, they spotted the victim parked in Fred's parking lot. The Defendant said that Mr. Thompson handed him the .38 caliber handgun and instructed him to approached the victim by entering the passenger side of the victim's car. The Defendant said that he entered the car and ordered the victim to drive. The Defendant said that he held the gun on his lap.

The Defendant told investigators that the victim exited the parking lot and then suddenly began "jerking around like she was having a seizure." The Defendant told investigators that he had to take control of the car and pull over to the shoulder of the highway. When he pulled over, Mr. Thompson approached the vehicle, took the gun from the Defendant, and threatened the victim. Once the victim "came to," Mr. Thompson told the victim to follow the Defendant's car, and he then returned the gun to the Defendant. They stopped once more and Mr. Thompson got into the backseat of the victim's car and ordered the victim to switch seats with the Defendant. Mr. Thompson gave Ms. Mosely money to purchase gas for the Defendant's car and told her to return to Jackson. Mr. Thompson then instructed the Defendant to drive to a dirt road. The Defendant said that, once they arrived at the dirt road, Mr. Thompson dragged the victim from the car and told the Defendant to turn the vehicle around to watch for traffic on the highway. The Defendant told investigators that he heard a single gunshot as he turned the vehicle. The Defendant denied seeing Mr. Thompson shoot the victim. When he did turn to look, the Defendant saw the victim "laying face down and M[r. Thompson] standing a couple of feet away from her and looking at the gun." The Defendant told investigators that he then pulled the car around to get Mr. Thompson. He said that the two sat in silence for some time until Mr. Thompson said, "'Man, it was hard to pull the trigger.'"

In his second statement to investigators, the Defendant said that he and Mr. Thompson returned to the highway and found Ms. Mosely driving around, apparently lost. They met at a gas station, and Mr. Thompson then rode with Ms. Mosely in the Defendant's car. After dropping the Defendant's car off at Lincoln Elementary School, the trio stopped at Dick's Sporting Goods where the Defendant purchased black batting gloves. They bought some marijuana on their way to Memphis. When the trip to Memphis proved fruitless, they returned to Madison Apartments in Jackson. They set fire to the victim's car later that evening after salvaging several items from the car.

On March 16, 2009, the Defendant initiated contact with the investigators and gave a third statement. After executing a third waiver of rights, the Defendant told the investigators that he only turned the car around once while on the dirt road. He also said that he heard the gunshot while turning the car and looked to see Mr. Thompson standing over the victim. When Mr. Thompson returned to the car, he told the Defendant that he shot the victim because she had a cellular telephone in her pocket. The Defendant told investigators that the Pepsi found in the trunk of his car had been taken from the victim's car. He explained to the investigators that he was "in pretty bad shape money wise" and did not want to move home so he "just got caught up needing money and listening to M[r. Thompson]."

Captain Patrick Willis of the JPD assisted Sergeant Kemper during each of the Defendant's statements. Captain Willis witnessed each rights waiver executed by the Defendant at the Jackson Police Department. Captain Willis testified that searches of the Defendant's parent's home and the Defendant's girlfriend's apartment uncovered black Dickie pants, black Air Jordans, and bandanas resembling those seen in the surveillance video. On March 17, 2009, Captain Willis accompanied the Defendant to TBI headquarters where the Defendant agreed to take a polygraph examination and ultimately gave a fourth statement. Captain Willis testified that the Defendant went to the TBI office voluntarily and was not handcuffed during the interview. He recalled the Defendant's executing a fourth rights waiver and polygraph consent form. Before TBI Special Agent Valerie Trout could begin the polygraph examination, however, the Defendant admitted to Special Agent Trout, "I shot her." Once the Defendant made this inculpatory admission, the tenor of the interview changed from a polygraph examination to an interrogation. Therefore, the Defendant never took a polygraph test.

TBI Special Agent Valerie Trout met with the Defendant on March 17, 2009, to administer a polygraph examination. She testified at trial, "After talking to [the Defendant] for a short period, he dropped his head and told me that he was in fact the one who shot the woman." Once the Defendant made this admission, Special Agent Trout called Captain Willis into the interview room. The Defendant then agreed to give a statement.

In his fourth statement, the Defendant explained that Mr. Thompson wanted to obtain untraceable cars to use in robberies in Memphis. He said, "The plan was to target an older person, take them out of town, [and] drop them off somewhere." The Defendant told Special Agent Trout and Captain Willis that he wore black Air Jordan tennis shoes, black Dickie pants, a black sleeveless t-shirt, and a black hoodie on the day of the victim's death. He told the investigators that he and his cohorts followed an elderly couple from the Fred's parking lot to the couple's home, but the trio abandoned their plan to steal the couple's car because too many people were outside. Next, the trio followed a woman in a white BMW to a parking lot, but they also abandoned their plan to steal her vehicle. They returned to Fred's parking lot where they soon spotted the victim in her car. The Defendant said that Mr. Thompson gave him a gun and told him to approach the victim. The Defendant again said that the victim suffered a seizure while driving, causing them to pull over. He told investigators that Mr. Thompson walked over to the victim and said, "Cooperate or I'll kill you right here." Mr. Thompson handed the gun back to the Defendant. Soon, they stopped again. This time, Mr. Thompson got into the victim's car and sent Ms. Mosely to get gas for the Defendant's car.

The Defendant told investigators that when they drove to the dirt road and parked, Mr. Thompson pulled the victim from the car and told the Defendant to keep a lookout. When the Defendant looked back at Mr. Thompson, Mr. Thompson told the Defendant that he "could not pull the trigger." Mr. Thompson gave the gun to the Defendant, who was still seated in the driver's seat of the victim's car. The Defendant told investigators that he wanted to hand the gun back to Mr. Thompson, but he feared Mr. Thompson would shoot him. He said, "I had a thought that [Mr. Thompson] may shoot me so I shot the lady from the driver's window." He added, 'I think I shot her in the head."

The Defendant told investigators that Mr. Thompson became angry with the Defendant because "he wasn't the one to shoot" the victim. The men drove to Jackson where the Defendant stopped at Dick's Sporting Goods to purchase gloves. They bought marijuana. They then drove to Memphis to commit a robbery but abandoned that plan once they were unable to find any suitable victims. The Defendant said that they "counted everything as a loss" and returned to Jackson. After returning to Jackson, they salvaged the floor mats, folding chairs, and Pepsi bottles from the victim's car before setting the car on fire. The Defendant told investigators that Mr. Thompson told him that he "had gained gang status" and would "make [him] second in command."

On cross-examination, Special Agent Trout testified that the Defendant "knew absolutely that he was there for the purpose of a polygraph examination involving the homicide of Carolyn Ward" and that the Defendant came to TBI headquarters voluntarily. She explained that she never administered the polygraph test because after the Defendant

made his initial admission, Special Agent Trout could no longer function as an unbiased examiner. She further stated that the Defendant's admission eliminated any "unresolved" issues relative to the investigation of the case.

Mary Sedberry, a Henderson restaurant owner, testified at trial that on March 7, 2009, a car followed her to the back parking lot of her restaurant as she returned from buying cigarettes in her white BMW. She recalled, "[A]s I was proceeding to go to the backdoor not too far from the car I immediately heard something come around and there came the blue car around with three people in it." She said an African-American woman drove the car with one African-American male riding in the passenger seat and another riding in the backseat. Ms. Sedberry recalled that the driver said that she "thought this was a drive-thru." Ms. Sedberry testified that she told the woman, "[H]ell no it's not a drive-thru." She recalled that the three individuals looked shocked by her response and then drove away. After viewing photographs of the Defendant's vehicle, Ms. Sedberry maintained "that is the same car that followed me around the restaurant."

Reida Watson, a Dick's Sporting Goods Assistant Manager, testified that the JPD requested surveillance video of the store from March 7, 2009. A review of the video revealed the Defendant's purchasing black batting gloves at 3:20 p.m. that day. Ms. Watson testified that the Defendant used his rewards card to make the purchase.

JPD Investigator Charles Mathis assisted in the March 12, 2009 search of Mr. Thompson and Ms. Mosely's shared apartment. He collected black clothing and two-liter bottles of Pepsi from the apartment. He testified at trial that he collected the Pepsi because he suspected it had been taken from the victim's car.

On March 11, 2009, JPD Lieutenant Julian Wiser searched the apartment of Lakeisha Carroll, one of the Defendant's girlfriends with whom the Defendant had been staying. Lieutenant Wiser collected mail addressed to the Defendant, a title indicating the Defendant's ownership of the blue Buick Roadmaster, digital scales and baggies, black Nike tennis shoes, an orange t-shirt, a black t-shirt, brown pants, .22 caliber bullets, and a box of .38 caliber Remmington ammunition from the apartment. He also collected a cellular telephone and a handicapped hang-tag, both of which were later identified as belonging to the victim.

David Nagi, the owner of a BP gas station, provided surveillance video of his store from March 7, 2009. The video showed a man wearing an orange t-shirt dancing at the register while another man purchased bottles of Jungle Juice and root beer. Mr. Nagi's nephew, Eddie Saleh, testified that he worked for his uncle at the gas station. He recognized the Defendant on the surveillance video as an occasional customer at the store.

TBI Special Agent Mark Lewis assisted in the investigation of the victim's murder. He obtained surveillance video from Mr. Nagi's gas station showing the Defendant dancing in the store while Mr. Thompson purchased Jungle Juice and root beer. Special Agent Lewis obtained DNA samples from the Defendant and Ms. Mosely, but Mr. Thompson did not volunteer a sample. Special Agent Lewis testified that Mr. Thompson's DNA sample was already in the database. Special Agent Lewis reviewed photographs and text messages on the Defendant's cellular telephone. Photographs taken from the Defendant's telephone showing the Defendant wearing an orange t-shirt and holding a gun were admitted into evidence at trial.

Chinita Perry testified that she dated the Defendant briefly in March 2009. She recalled showing Special Agent Lewis text messages she had received from the Defendant during the time surrounding the victim's death. At trial, Ms. Perry acknowledged the accuracy of the text message records. On March 7, 2009, at 11:30 a.m., the Defendant sent Ms. Perry a text message that he was "on the road" that day. Later that afternoon, the couple discussed meeting the following Monday. Throughout the evening, Ms. Perry received scattered responses from the Defendant. On March 10, 2009 at 4:47 p.m. the Defendant sent Ms. Perry a text message: "Just got stopped. Fixing to go to jail. I love you, babe." He also asked Ms. Perry to telephone his parents. At 5:31 p.m., the Defendant sent another text message: "They fixing to tow it. They found a gun. Don't tell him about gun." Ms. Perry explained that the Defendant did not want his parents to find out about the gun discovered in his vehicle.

TBI Special Agent Miranda Terry, an expert in microanalysis, swabbed the Defendant's vehicle for evidence of gunshot residue. Special Agent James Russell Davis analyzed swabs collected by Special Agent Terry and determined that the black Nike batting gloves collected from the Defendant's vehicle contained gunshot residue particles. His testing also revealed the presence of gunshot residue particles on the driver's side door, passenger door, steering wheel, gearshift, and console. He did not discover the presence of any gunshot residue particles on any of the Defendant's clothing. He explained that the absence of gunshot residue on the clothing did not necessarily rule out the Defendant's shooting a weapon because the clothing could have been washed. Likewise, if the Defendant shot the victim while seated in the car, the door would have prevented gunshot residue particles from scattering to his clothing.

Special Agent Hunter Greene, a latent fingerprint examiner with the TBI Crime Laboratory, examined items collected from the Defendant's vehicle and residence to determine the presence of fingerprints. He found no identifiable prints on the handgun, floor mats, cartridges, license tags, cellular telephone, or shell casings submitted for examination. He did, however, find an identifiable print matching the Defendant on the disabled hang tag

recovered from the Defendant's apartment. He testified that the absence of prints could be explained by the Defendant's wearing gloves during the offenses.

Special Agent Jennifer Shipman, an expert in serology analysis, examined both pairs of gloves collected from the Defendant's vehicle. She did not find the presence of the victim's DNA on either pair of gloves. She did not find either the Defendant's or Ms. Mosely's DNA on the green and white gloves. She did, however, determine that the Defendant was "the major contributor" of DNA to the black Nike gloves.

Special Agent Robert Daniel Royce, an expert in firearms and ballistics, examined the .38 handgun collected from the Defendant's vehicle. He testified that the "Fratelli Tanfoglio Model EA 380 semi-automatic pistol" was manufactured with three safety features, two of which had to be manually disengaged before firing. He determined that the gun was fully functional with no operational issues. His examination of the .38 caliber cartridge found in the ashtray of the Defendant's vehicle, the shell casing found at the scene, and the bullet found at the scene revealed markings consistent with having been fired from the Fratelli Tanfoglio pistol. He also opined that the box of ammunition recovered from the Defendant's apartment matched the ballistics evidence found at the scene.

With this evidence, the State rested its case. The trial court denied the Defendant's motion for judgment of acquittal. The record next reveals a colloquy between the Defendant and the trial court concerning the Defendant's decision to testify against the advice of counsel.

The 28-year-old Defendant testified, denying any involvement in the victim's kidnapping or murder. He did admit, however, to tampering with evidence when he assisted Mr. Thompson in setting the victim's car on fire. The Defendant initially denied signing multiple rights waivers but ultimately admitted that he talked with investigators voluntarily. He denied the veracity of his statements to the investigators and claimed that he felt threatened by them. He denied traveling to Henderson. He denied driving the victim's car. He claimed that Mr. Thompson and Ms. Mosely borrowed his car while he stayed in Jackson and explained that he knew details of the murder from talking to Mr. Thompson and Ms. Mosely. The Defendant acknowledged that he initialed and signed each statement, but he denied their truthfulness. Regarding his statement made to Special Agent Trout, he claimed he only spoke to the TBI because he was promised a polygraph examination. He explained that he told Special Agent Trout that he shot the victim after becoming frustrated by Agent Trout's delaying the polygraph examination.

On cross-examination, the Defendant admitted going to the BP gas station to purchase gasoline and Jungle Juice, but he claimed he did not know that the victim had been killed.

When confronted with his text messages to Ms. Perry, the Defendant claimed that he told her he was out "making some moves" because he did not want to be bothered by her on that day. He admitted that his black gloves might have contained gunshot residue but claimed that the presence of the residue resulted from a secondary transfer, not his firing a weapon. The Defendant testified that he felt threatened by Mr. Thompson. He said that he admitted all the crimes "[t]o get out of trouble" and that he "felt like [he] had no other choice but to say [he] did it in order to take the lie detector test." The Defendant maintained that a lie detector test would have shown that he was lying when he made his inculpatory statements. The Defendant also denied telling any cell mates in jail that he had shot the victim.

Hywon Reed, a former cell mate of the Defendant, testified in rebuttal for the State. He said that he and the Defendant shared a cell for approximately two days in December 2010. He testified that the Defendant described his participation in the offenses in great detail. The Defendant told Mr. Reed that the victim "pissed him off" when she would not give him any money or her automated teller machine code. The Defendant told Mr. Reed that the victim threatened to telephone the police, so the Defendant decided to kill her.

With this evidence, the guilt phase of the Defendant's bench trial concluded. The trial court found the Defendant guilty of first degree premeditated murder, first degree murder committed in the perpetration of an especially aggravated kidnapping, especially aggravated kidnapping, and tampering with evidence. By agreement of the parties, the sentencing phase of the bench trial was scheduled for several weeks later.

At the sentencing phase of the trial, Captain Willis testified that the Defendant admitted in his statements to participating with Mr. Thompson in the February 24, 2009 robbery of the Upper Level Hair Salon in Jackson because he "needed the money." A presentence investigation report prepared by Bruce Ingram of the Tennessee Board of Probation and Parole documented the Defendant's history of criminal convictions consisting of multiple driving offenses and a theft dating back to 2004. The criminal history also documented the Defendant's 2010 conviction for the March 5, 2009 aggravated robbery of a Dollar General Store. Following this proof, the trial court sentenced the Defendant to 20 years' incarceration to be served at one hundred percent for the especially aggravated kidnapping conviction and to five years' incarceration for the tampering with evidence conviction. The trial court also found the Defendant qualified for consecutive sentencing as a dangerous offender and ordered these sentences to be served consecutively.

Concerning the Defendant's punishment for first degree murder, Captain Willis testified that the Defendant disclosed details of the March 5, 2009 Dollar General Store aggravated robbery during one of his statements. The Defendant told investigators that he "had the only gun" and that he entered the store before Mr. Thompson. He disclosed that

both he and Mr. Thompson were disguised to avoid identification. He admitted that they split the $80 proceeds of the robbery. The Defendant pleaded guilty to this offense and received a 12-year sentence.

Sergeant Kemper testified that the Defendant told him that the victim "had to die" because she had seen his and Mr. Thompson's faces.

Rhonda Hunt, a nurse practitioner who had treated the victim, testified that the 60-year-old victim suffered from morbid obesity, arthritis, cellulitis, edema in her legs, seizures, and blood clots. She said that the victim's legs were two to three times their normal size due to swelling and that the victim "could not actually physically lift her legs." She explained that the victim suffered "absence seizures" during which she would lose consciousness for seconds at a time. Ms. Hunt said that the seizures were often prompted by stress. Ms. Hunt recalled that, despite her obvious physical limitations, the victim was "the sweetest, most gentle person God could create."

Jimmy Dyer, retired principal of West Chester Elementary School, testified that the victim performed volunteer work at the elementary school. He recalled all the children calling her "Granny." He said that the victim had no enemies and that she, in fact, provided selflessly for many of the children's needs and was always an encouragement to the teachers at the school.

Mary Davis, the victim's daughter, testified that her mother was generous beyond her means. She said that the victim made quilts for every baby born in Chester County, whether she knew the family or not. Ms. Davis said that she thinks about her mother every day.

Paula Renee Johnson, the Defendant's mother, described the Defendant as a "normal child" who did well in school, was baptized at the age of 15, graduated from high school, and attended some college. She said that the Defendant was very close to his younger brother. She also said that the Defendant maintained a relationship with his own children, a five-and-one-half-year-old daughter and a one-year-old son.

Johnny Johnson, the Defendant's step-father, testified that he married the Defendant's mother when the Defendant was only two years old. He explained that he is the only father that the Defendant has known. He admitted that the Defendant had a history of driving offenses, usually due to his inability to afford insurance. Mr. Johnson testified that the Defendant was "never a violent person." On cross-examination, Mr. Johnson admitted that the Defendant confessed his involvement in the offenses to him. He claimed, however, that the Defendant was not guilty because the "story changed" later.

Howard Jerrell Johnson, the Defendant's brother, testified that the Defendant loves his children and wishes he could change "where he's sitting at right now." Mr. Johnson asked the trial court to show leniency and forgiveness to the Defendant.

The Defendant apologized, yet maintained his innocence. While admitting that he "was there" at the previous robberies, the Defendant denied robbing anyone or possessing a gun during the robberies. Likewise, he denied telling Sergeant Kemper that he killed the victim because she had seen their faces. He said that "crime wasn't [his] way" and that "[f]or the most part" the other participants were responsible for the victim's death.

At the conclusion of the sentencing phase hearing, the trial court found that the State had proven beyond a reasonable doubt the existence of three aggravating circumstances: that the Defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person; that the murder was committed for the purpose of avoiding a lawful arrest or prosecution; and that the murder was knowingly committed while the Defendant had a substantial role in committing an aggravated robbery. The trial court did not find the existence of any mitigating circumstances. Thus, the court ruled that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and sentenced the Defendant to death for each first degree murder conviction.

On appeal, the Defendant challenges the trial court's denial of his motion to suppress statements, the sufficiency of the evidence to support his convictions of first degree murder and especially aggravated kidnapping, the trial court's imposition of the death penalty, and the constitutionality of the death penalty. The State argues that the Defendant's appeal is untimely and should be dismissed. Alternatively, the State argues that the Defendant waived any issue concerning the denial of his motion to suppress by failing to include a transcript of the suppression hearing in the record on appeal, that the evidence is sufficient to support the convictions, and the death penalty is appropriate in this case.

## ANALYSIS

### *Timeliness of the Notice of Appeal*

Initially, we must address the State's argument that the Defendant's appeal should be dismissed because the Defendant failed to file a timely notice of appeal. The Defendant fails to address this argument in any responsive brief or pleading. The record reflects that the trial court entered judgments on May 26, 2011. Fifty-three days after the entry of judgments, on July 18, 2011, the Defendant filed a motion to set aside the death penalty, motion for judgment of acquittal pursuant to Tennessee Rule of Criminal Procedure 29, and a motion for new trial pursuant to Tennessee Rule of Criminal Procedure 33. The trial court denied

these motions on August 1, 2011. The Defendant filed a notice of appeal on August 24, 2011.

Rule 29 provides that after a jury has returned a verdict of guilty, "a defendant may move for a judgment of acquittal . . . within 30 days of the date the order of sentence is entered." Likewise, Rule 33(b) provides that a motion for new trial must be filed "within thirty days of the date the order of sentences is entered." Furthermore, Rule 45(b)(3) specifically forbids the trial court from "extend[ing] the time for taking any action under the Rules of Criminal Procedure 29, 33 and 34." *See State v. Martin*, 940 S.W.2d 567, 569 (Tenn. Crim. App. 1997) (stating that 30-day time limit is mandatory and cannot be extended). "Subsequent review or considerations by the trial court or agreements of parties to hear a late-filed motion will not validate the motion for purposes of appellate review." *State v. Heather Massengill*, E2006-02602-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., at Knoxville, May 12, 2008) (citing *State v. Dodson*, 780 S.W.2d 778 (Tenn. Crim. App. 1989); *State v. Davis*, 748 S.W.2d 206 (Tenn. Crim. App. 1987)); *see also Martin*, 940 S.W.2d at 569. The State correctly notes, however, that the Defendant in this case was not required to file a motion for new trial in order to preserve his issues on appeal because he was convicted at a bench trial. *See* Tenn. R. App. P.3(e) (providing that "*in all cases tried by a jury*, no issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for new trial").

Tennessee Rule of Appellate Procedure 4(a) requires the filing of a notice of appeal "within 30 days after the date of entry of the judgment appealed from." Certain post-trial motions, such as a motion for judgment of acquittal or motion for new trial, *when timely filed*, toll the time for filing the notice of appeal "from entry of the order denying a new trial or granting or denying any other such motion." Tenn. R. App. P. 4(c). Because the Defendant's post-trial motions in this case were untimely and ineffectual, the notice of appeal was also untimely. The timely filing of a notice of appeal, however, is not a prerequisite to the jurisdiction of this court, and this court may waive the requirement of the timely filing of a notice of appeal in the interest of justice. Tenn. R. App. P. 4(a).

As previously noted, the Defendant fails to address the timeliness of the notice of appeal in any responsive brief or pleading before this court. This court has advised that "the more proper and efficient practice for a party seeking a waiver of the timeliness of the notice of appeal is to file a motion with this court requesting the waiver pursuant to Tennessee Rule of Appellate Procedure 4(a)." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). That being said, we also recognize this court's statutory authority to review by direct appeal any first degree murder conviction in which the death penalty is imposed, even in the absence of a defendant's seeking such review. *See* Tenn. Code Ann. § 39-13-206(a)(2).

Accordingly, we determine that the interest of justice requires a waiver of the timely filing of a notice of appeal in this case. We will now review each of the Defendant's issues in turn.

*Suppression of Statements*

The Defendant argues that the trial court erroneously denied his motion to suppress his statements. Although the record reflects that the Defendant filed a pretrial motion to suppress alleging that each of his statements were involuntary and the product of an illegal arrest, the Defendant's argument on appeal focuses predominantly on the trial court's admission of his fourth statement made to Special Agent Trout. The Defendant alleges that he made this statement only when promised a polygraph examination that was ultimately never administered. The Defendant also makes a general argument that his three previous statements were involuntary because "there were [n]ever any offers of food or drink during the questioning." The State argues that the Defendant has waived this issue by failing to include a transcript of the suppression hearing in the record on appeal. *See* Tenn. R. App. P. 24(b) ("the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). On January 7, 2013, we sua sponte ordered the record supplemented with the suppression hearing transcript. On February 5, 2013, the appellate court clerk received and filed the supplemental transcript. On March 6, 2013, the State filed a supplemental brief.

The record reflects that on March 24, 2010, the Defendant filed a motion seeking suppression of all statements and any evidence obtained from searches of the homes of the Defendant's parents and girlfriend. In the motion, the Defendant claimed he did not knowingly waive his rights prior to giving his statements, that searches of the homes were conducted without consent, and that any evidence flowing from his arrest was tainted by the illegality of his March 10, 2009 arrest.

At the April 14, 2010 suppression hearing, Chief Deputy Mark Griffin testified concerning his involvement in the investigation of the victim's death. He stated that after viewing the surveillance video from the Piggly Wiggly parking lot, "[i]t was obvious that the [defendant's] blue Buick Rodamaster was following the [victim's] Corsica."

Investigator Phillip Kemper testified at the suppression hearing that Chief Deputy Griffin briefed the JPD gang enforcement team concerning the victim's homicide. Investigator Kemper located the Defendant in his vehicle on March 10, 2009. Investigator Kemper testified that he arrested the Defendant for driving on a suspended license and that a .38 caliber handgun was found sticking out from underneath the passenger seat of the Defendant's vehicle. Investigator Kemper testified that he took three statements from the

Defendant. He recalled the Defendant initiating the third statement. Prior to each statement, Investigator Kemper advised the Defendant of his Miranda rights and the Defendant executed a waiver of rights. Investigator Kemper testified that the Defendant confessed to participation in two local robberies, leading to further charges while the murder investigation continued. Investigator Samuel Gilley testified consistently with Investigator Kemper's testimony concerning the apprehension and questioning of the Defendant.

Lieutenant Patrick Willis testified at the suppression hearing that the Defendant executed three rights waivers prior to giving statements to investigators. He also recalled obtaining the Defendant's consent to search his vehicle and areas of both the Defendant's parent's and his girlfriend's homes. Lieutenant Willis testified that the Defendant agreed to take a polygraph examination with TBI Agent Valerie Trout. He recalled advising the Defendant of his rights a fourth time and the Defendant's signing a fourth rights waiver. He said, "Prior to the polygraph beginning [the Defendant] told Ms. Trout that he wanted to tell the truth about the situation. At that point she stopped prepping him for the polygraph and she summoned me back in the room." The Defendant then confessed to shooting the victim.

Following the presentation of this evidence by the State, the Defendant presented no other proof or argument and "submit[ted] the motion to the court." The State argued that "multiple waivers [occurred]" evidencing the voluntariness of the Defendant's statements. The court found that the investigators had reasonable suspicion to stop the Defendant's vehicle and then had probable cause to arrest the Defendant for driving on a suspended license. The court found that the handgun was recovered in plain view during the stop. Regarding the Defendant's four statements to investigators, the court found that the evidence was "unchallenged" that the Defendant waived his rights voluntarily and "never once requested an attorney." The court further found that the evidence was "uncontroverted" that the Defendant freely, voluntarily and intelligently gave each statement. Based upon these findings, the trial court denied the motion to suppress.

At trial, the Defendant challenged the admission of the fourth, and most inculpatory, statement alleging for the first time that he was coerced by promises of a polygraph examination. The record reflects that the trial court specifically asked counsel whether the issue of the polygraph examination had been raised pretrial, and counsel admitted that the Defendant had not challenged the admission of the statement in that vein prior to trial. While noting that the motion to suppress failed to challenge the admission of the fourth statement relative to the promise of a polygraph examination, the trial court allowed the Defendant to elicit testimony concerning the invitation to take the polygraph test and Special Agent Trout's ultimate decision not to administer the test. The trial court did not, however, make any ruling concerning suppression of the fourth statement relative to the polygraph examination claim.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to the facts *de novo,* however. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

To the extent that the Defendant challenges the voluntariness of his first three statements, we conclude that the evidence does not preponderate against the trial court's findings at the suppression hearing. The evidence presented at both the suppression hearing and at trial established that the Defendant voluntarily waived his *Miranda* rights before making each statement. The evidence further showed that the Defendant initiated conversations with the investigators on two occasions. Although he denied the veracity of his statements to the police when testifying at trial, the Defendant admitted at trial that he gave each statement voluntarily. Accordingly, the Defendant is not entitled to relief as to this issue.

We further conclude that the Defendant's failure to include the allegation of coercion by promise of a polygraph examination in the motion to suppress filed pretrial results in a waiver of the issue on appeal. *See* Tenn. R. Crim. P. 12(b)(2)(C) (listing a motion to suppress as a motion that "must be raised before trial"). We also note that the trial court was not asked to make and did not make any ruling concerning the polygraph issue. Under these circumstances, we conclude that the Defendant waived review of the issue as it relates to the promise of a polygraph examination.

*Sufficiency of the Evidence*

Next, the Defendant argues that the evidence is insufficient to support his convictions of first degree premeditated murder, felony murder committed in the perpetration of an especially aggravated kidnapping, and especially aggravated kidnapping. The Defendant does not challenge the sufficiency of the evidence to support his conviction of tampering with the evidence. The Defendant contends that the State failed to establish the *corpus delicti* arguing that "the Defendant's conviction was based solely on the Defendant's confession." The State argues that the evidence sufficiently established the Defendant's convictions.

When an accused challenges the sufficiency of the convicting evidence, our standard on review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

-19-

beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces if with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*.; *see Bland*, 958 S.W.2d at 660.

Felony murder is "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . kidnapping. . . ." Tenn. Code Ann. § 39-13-202(a)(2).

"Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302, [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305. False imprisonment is the knowing removal or confinement of "another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302.

The Defendant argues that the State failed to establish the *corpus delicti* in that his conviction is based solely upon his uncorroborated confession. As recently noted by our supreme court, "a criminal conviction cannot be based *solely* on a defendant's uncorroborated confession." *State v. Wagner*, 382 S.W.3d 289, 297-98 (Tenn. 2012) (citing

*State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008); *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911); *Williams v. State*, 80 Tenn. 211, 212-13 (1883)). In *Wagner*, the court explained that "th[e] rule requiring corroboration of a confession is known as the *corpus delicti* rule." *Id*. at fn 9 (citing *United States v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010)). As the court also noted in *Wagner*, we are cognizant that the issue of whether the *corpus delicti* rule should be abrogated or modified is presently pending before the supreme court. *State v. Bishop*, No. W2010-01207-SC-R11-CD (Tenn. Aug. 15, 2012) (order granting Tennessee Rule of Appellate Procedure 11 application and requesting additional briefing concerning the *corpus delicti* rule). In any event, we conclude that the *corpus delicti* rule does not garner the Defendant any relief because his confession was sufficiently corroborated by physical evidence and witness testimony.

Eyewitness testimony placed the Defendant in Henderson in the company of Mr. Thompson and Ms. Mosely on the day of the victim's murder. Surveillance video recordings admitted at trial established the Defendant's presence and participation in the initial kidnapping of the victim, as well as the Defendant's presence with Mr. Thompson throughout the day. Gunshot residue, ballistic evidence, and fingerprint evidence likewise revealed the Defendant's involvement in the offenses. In addition to the Defendant's admissions to investigators and to a cell mate that he shot the victim, the record as a whole sufficiently established the Defendant's guilt of the first degree murder and especially aggravated kidnapping.

Having found the evidence sufficient to support the Defendant's convictions, we do note, however, that the trial court failed to merge the felony murder conviction into the premeditated murder conviction at sentencing. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) ("Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction. . . ."). Accordingly, we direct the trial court to correct the judgments on remand to effectuate proper merger of the convictions.

*Imposition of the Death Penalty*

The Defendant challenges the trial court's imposition of the death penalty. Citing to the inapplicable 1982 version of the first degree murder sentencing statute, *see* Tenn. Code Ann. § 39-13-203(g), the Defendant argues that "his mitigating factors outweighed any aggravating factors." The argument relative to this issue contains no other reference to authority and simply relates that the trial court should have given more weight to the mitigating circumstances proffered by the Defendant. We could deem this issue waived for the Defendant's failure to cite to authority in support of his arguments. *See* Tenn. Ct. Crim.

App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The State argues that the evidence supported the trial court's findings and ruling relative to punishment.

Tennessee Code Annotated section 39-13-204(g)(1) mandates the imposition of a death sentence when two criteria are met:

> (A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and
> (B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt.

Tenn. Code Ann. § 39-13-204(g)(1). The trial court found that the State had proven three statutory aggravating circumstances beyond a reasonable doubt: "[t]he defendant was previously convicted of one (1) or more felonies, other then the present charge, whose statutory elements involve the use of violence to the person," *id*. § 39-13-204(i)(2), "[t]he murder was committed for the purpose of avoiding . . . a lawful arrest or prosecution of the defendant or another," *id*. §39-13-204(i)(6), and "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . [an] aggravated robbery," *id*. §39-13-204(i)(7). The trial court further found that no mitigating circumstances existed. Consequently, the trial court found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and determined that the defendant should be sentenced to death for his convictions of first degree murder. *See id*. § 39-13-204(g)(1).

As to the aggravating circumstance that the defendant was previously convicted of one or more felonies involving the use of violence, Captain Willis testified that the Defendant confessed his participation in the February 24, 2009 aggravated robbery of the Upper Level Hair Salon. Significantly, the Defendant also confessed to Captain Willis his participation as the sole gunman during the March 5, 2009 aggravated robbery of a Dollar General store. The Defendant pleaded guilty to the Dollar General robbery prior to the trial in this case. In our view, the evidence sufficiently established this aggravating circumstance.

Testimony presented at the trial showed also that the Defendant killed the victim to avoid being arrested. In statements to investigators, the Defendant said that the victim, having seen his and Mr. Thompson's faces, could identify them. The Defendant told a cell mate that he shot the victim when the victim threatened to telephone the police on her cellular telephone. At the sentencing phase hearing, Sergeant Kemper testified that the

Defendant told him that the victim "had to die" because she had seen his and Mr. Thompson's faces. The evidence sufficiently established that the murder was committed to avoid arrest.

As to the aggravating circumstance that the defendant committed the murder in the perpetration of an aggravated robbery, the Defendant's statements indicated that he and his cohorts planned to steal the victim's car so that they could use it to commit additional robberies in nearby Memphis. A search of the Defendant's residence also uncovered items belonging to the victim. In our view, the evidence sufficiently established that the murder was committed in the perpetration of an aggravated robbery.

As to the mitigating evidence presented by the Defendant, the Defendant's family members testified that the Defendant was the father to two young children whom he loved very much. His family testified that he had a normal childhood and made good grades in school but that the Defendant struggled to "make it on [his] own" as an adult. Each family member asked the trial court for leniency in sentencing. The Defendant testified at the sentencing hearing, maintaining his innocence. He stated that others were responsible for the victim's death "[f]or the most part" and that "crime wasn't [his] way." Based upon this evidence, the trial court found no mitigating factors.

Having carefully reviewed the evidence presented at both the trial and sentencing phases of the Defendant's capital bench trial, we conclude that the evidence fully supports the trial court's findings relative to the aggravating and mitigating circumstances and that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

*Constitutionality of the Death Penalty and Proportionality Review*

In his final issue, the Defendant lodges myriad attacks upon the constitutionality of the death penalty under both the Eighth and Fourteenth Amendments of the United States Constitution and Article I, sections Eight and Sixteen of the Tennessee Constitution. The Defendant, however, fails to cite to any authority in support of his arguments. For this reason, we could deem these issues waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). That being said, we choose to review each claim as outlined in the Defendant's brief.

First, the Defendant contends "that the death sentence infringes upon his fundamental right to life." This argument has been rejected previously by our supreme court. *State v. Hester*, 324 S.W.3d 1, 78-79 (Tenn. 2010).

The Defendant contends that Tennessee's death penalty statutes fail to "sufficiently narrow the population of defendant convicted of first degree murder who are eligible for a sentence of death." Our supreme court has rejected this argument. *Terry v. State*, 46 S.W.3d 147, 159 (Tenn.), *cert. denied*, 122 S. Ct. 553 (2001).

The Defendant argues that Tennessee's death penalty statutes fail to "limit the exercise of the [trier of fact's] discretion because, once the [trier of fact] finds aggravation it can impose a death sentence no matter what mitigation is shown." This argument has been rejected by our supreme court. *State v. Smith*, 857 S.W2d 1, 21-22 (Tenn. 1993).

The Defendant argues that Tennessee's death penalty statutes unconstitutionally mandate the trier of fact to impose the death penalty upon a finding that the aggravating circumstances outweigh the mitigating circumstances. This argument has been rejected by our supreme court. *State v. Boyd*, 797 S.W.2d 589, 596 (Tenn. 1990), *cert. denied*, 111 S. Ct. 800 (1991).

The Defendant argues that Tennessee's death penalty statute is unconstitutional because it fails to "require the [trier of fact] to make the ultimate determination that death is appropriate." This argument has been rejected by our supreme court. *State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994).

The Defendant contends that Tennessee's death penalty statutes fail to "inform the [trier of fact] of its ability to impose a life sentence out of mercy." This argument has been rejected by our supreme court. *State v. Cauthern*, 967 S.W.2d 726, 749 (Tenn. 1998); *State v. Cazes*, 875 S.W.2d 253, 269 n.6 (Tenn. 1994).

The Defendant argues that Tennessee's death penalty statutes unconstitutionally "prohibit the [trier of fact] from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase." This argument has also been rejected by our supreme court. *Terry*, 46 S.W.3d at 170; *Brimmer*, 876 S.W.2d at 87; *Cazes* 875 S.W.2d at 268.

The Defendant argues that the death penalty is cruel and unusual punishment and that lethal injection, specifically, is cruel and unusual. Both arguments have been rejected by our courts. *State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied*, 121 S. Ct. 1233 (2001) (rejecting general argument that the death penalty is cruel and unusual); *State v. Banks*, 271 S.W.3d 90, 108 (Tenn. 2008) (rejecting specific claim that lethal injection is cruel and unusual). Furthermore, the Supreme Court has rejected the same challenge to Kentucky's lethal injection protocol. *Baze v. Rees*, 553 U.S. 35 (2008).

The Defendant argues that the death penalty is imposed in Tennessee in a capricious, arbitrary, and discriminatory manner "on the basis of race, sex, geographic region and economic and political status of the defendant." This argument has been rejected by our supreme court. *State v. Thomas*, 158 S.W.3d 361, 407 (Tenn. 2005); *State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995).

In his final attack on the constitutionality of Tennessee's death penalty scheme, the Defendant argues that the statutes erroneously allow the State to make final closing arguments to the [trier of fact] during the sentencing phase of the trial. This argument has been rejected numerous times. *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 269; *State v. Caughron*, 855 S.W.2d 526, 542 (Tenn. 1993).

*Proportionality Review*

Finally, Defendant contends that the sentence of death in his case is disproportionate to the sentences imposed in similar cases. In reviewing a defendant's sentence of death for first degree murder, "the reviewing court shall determine whether . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206.

Our supreme court has explained comparative proportionality review as follows:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." *Id.* (citing *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. 1993)). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997) (citing *State v. Carter*, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." *Bland*, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." *Id.* (citing *State v. Webb*, 238 Conn. 389, 680 A.2d 147, 203 (Conn. 1996)).
>
> Our proportionality review is neither a rigid nor an objective test. *Hall*, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and

we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury or trier of fact. *Id.; Brimmer*, 876 S.W.2d at 84. This Court considers many variables when choosing and comparing cases. *Bland*, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. *Id.*; *Hall*, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants' age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. *Id*.

*State v. Hall*, 976 S.W.2d 121, 135 (Tenn. 1998).

We have compared the circumstances of the present case with the circumstances of similar cases and conclude that the sentence of death in this case is proportionate to the sentences imposed in similar cases. *See e.g.*, *State v. Powers*, 101 S.W.3d 383 (Tenn.), *cert. denied*, 123 S. Ct. 2083 (2003) (finding aggravating circumstances (i)(2), (i)(6), and (i)(7) and imposing death where defendant shot victim in head and committed aggravated robbery); *State v. Reid*, 91 S.W.3d 247 (Tenn. 2002), *cert. denied*, 124 S. Ct. 56 (2003) (finding aggravating circumstances (i)(2), (i)(6), and (i)(7) and imposing death despite evidence of defendant's troubled childhood, multiple head injuries, and brain abnormality where defendant shot and killed two fast food employees during a robbery); *State v. Chalmers*, 28 S.W.3d 913 (Tenn. 2000), *cert. denied*, 121 S. Ct. 1367 (2001) (finding aggravating circumstances (i)(2) and (i)(7) and imposing death where defendant shot and robbed sixty-nine-year old victim); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1994), *cert. denied*, 115 S. Ct. 417 (1994) (finding the (i)(5), (i)(6), (i)(7), (i)(12) aggravating circumstances, and imposing death despite fact that defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis and paranoid delusional disorder); *State v. Van Tran*, 864 S.W.2d 465 (Tenn. 1993), *cert. denied*, 114 S. Ct. 1577 (1994) (death sentence upheld based upon aggravating circumstances (i)(5) and (i)(12) where defendant shot and killed victims during a robbery of a restaurant); *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), *cert. denied*, 114 S. Ct. 1339 (1994) (finding aggravating circumstance (i)(2) and imposing death

where twenty-seven-year-old defendant shot and killed clerk during robbery of convenience store); *State v. King*, 694 S.W.2d 941 (Tenn. 1985) (thirty-three-year-old defendant murdered the proprietor of a tavern during the course of a robbery, death sentence upheld based upon aggravating circumstances (i)(2) and (i)(7)). We are of the opinion that the penalty imposed by the trial court in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with Tenn. Code Ann. § 39-13-206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the trial court's finding of the statutory circumstances, that the evidence supports the trial court's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by Defendant and conclude there is no reversible error. We do note, however, that the trial court failed to merge the felony murder conviction into the premeditated murder conviction. Accordingly, we remand the case and direct the trial court to amend the judgments to effectuate a proper merger of the first degree murder convictions. The judgments of the trial court are affirmed in all other respects.

_____
THOMAS T. WOODALL, JUDGE